This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant Patrick Shane Rafferty ("Rafferty") appeals from his convictions and sentence in the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} The tragic and gruesome events that occurred in early February 2005 read like a horror film. On February 5, 2005, a patrolman in West Virginia was called out to an open field near a farm house to investigate a report that a car had dumped something suspicious. Upon arriving, the officer noticed that the object that had been dumped was on fire. Once the fire department extinguished the *Page 2 
flames, officers realized that the object was a badly burned human corpse. The head of the body had been removed and lay at the feet of the corpse. Thereafter, West Virginia authorities tried without success to identify the body.
 {¶ 3} On August 7, 2005, Lisa Penix approached her cousin, Eric Berkheimer, an officer for the Mogadore Police Department. Penix described events that had occurred in the late evening of February 4, 2005. Penix described that she was at home on Voris Street in Akron, Ohio with Rafferty, William Kramer, Derek Shutt, Jason Keenan, and Steven Spade. Penix asserted that during the evening, Spade was murdered. Penix told Berkheimer that Rafferty had shot Spade in the head after beating him, that the body had been decapitated with a hacksaw, and that the body had been dumped in West Virginia and set on fire. Officers then contacted West Virginia, described Penix's account of events, and learned that West Virginia authorities had recovered a body in the condition described by Penix.
 {¶ 4} As a result of Penix's confession and subsequent investigation, Penix, Kramer, Keenan, Shutt, and Rafferty were charged with numerous crimes. Kramer and Shutt eventually plead guilty to aggravated murder and numerous other crimes and the State in turn recommended that they not receive the death penalty. Penix went to trial for her crimes and was found guilty of aggravated murder, kidnapping, tampering with evidence, and abuse of a corpse. Keenan, *Page 3 
meanwhile, agreed to testify truthfully and plead guilty to lesser crimes including tampering with evidence and obstruction of justice.
 {¶ 5} Based upon the above, Rafferty was indicted on the following charges: one count of aggravated murder in violation of R.C. 2903.01
with a death penalty specification pursuant to R.C. 2929.04; one count of kidnapping in violation of R.C. 2905.01(A)(3); three counts of tampering with evidence in violation of R.C. 2921.12(A)(1); and one count of abuse of a corpse in violation of R.C. 2927.01(B).
 {¶ 6} The matter proceeded to a jury trial. At the conclusion of his trial, Rafferty was found guilty of each of the charges against him. The matter then proceeded to a mitigation hearing. At the conclusion of that hearing, the jury recommended that Rafferty receive life in prison without the possibility of parole. The trial court, thereafter, sentenced Rafferty accordingly. Rafferty has timely appealed, raising seven assignments of error for review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT'S MOTION FOR CHANGE OF VENUE, IN VIOLATION OF APPELLANT'S 6TH AND 14TH AMENDMENT RIGHTS UNDER THE UNITED CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 7} In his first assignment of error, Rafferty alleges that the trial court erred in denying his change of venue. Specifically, Rafferty asserts that pretrial *Page 4 
publicity surrounding the crime prevented him from receiving a fair trial in Summit County. This Court disagrees.
 {¶ 8} "A decision to change venue rests largely within the discretion of the trial court." State v. Maurer (1984), 15 Ohio St.3d 239, 251, quoting State v. Fairbanks (1972), 32 Ohio St.2d 34, 37. Furthermore, "a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented [a defendant from] obtaining a fair and impartial jury from the locality." Maurer,15 Ohio St.3d at 251, quoting State v. Bayless (1976), 48 Ohio St.2d 73, 98. Accordingly, "[a] defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased." State v. Gross, 97 Ohio St.3d 121, 2002-Ohio-5524, at ¶ 29.
 {¶ 9} In the instant matter, voir dire was conducted over two days and resulted in over 800 pages of transcripts. On appeal, Rafferty has not alleged that any potential prejudice was demonstrated during any stage of this extensive voir dire. Moreover, each of the jurors who were seated swore that they could fairly judge the case on solely the facts presented at trial.
 {¶ 10} In an attempt to demonstrate that a juror was biased, Rafferty states as follows in his brief: "Appellant points to the fact that juror number one was excused between the guilt and mitigation phases of the trial. While the Court excused the juror for illness, the Appellant believes that the juror was actually biased[.]" Rafferty has offered no support for this unfounded allegation. A *Page 5 
careful review of the record indicates that the trial court was consistently concerned about the health of this juror and questioned the juror about health issues during the trial. Further, when the juror was replaced, she apologized repeatedly for being unable to complete her service.
 {¶ 11} Accordingly, there is nothing in the record to support a finding that Rafferty's jury was biased by pretrial publicity. The trial court conducted the "careful and searching" voir dire that is designed to remove any bias from the jury. This Court, therefore, cannot find that the trial court abused its discretion in denying Rafferty's motion for change of venue. Rafferty's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF APPELLANT'S 6TH AND 14TH AMENDMENT RIGHTS UNDER THE UNITED CONSTITUTION AND ARTICLE I, SECTION 10
OF THE OHIO CONSTITUTION."
 {¶ 12} In his second assignment of error, Rafferty asserts that he received ineffective assistance of counsel. Specifically, Rafferty argues that his trial counsel failed to adequately cross-examine witnesses and failed to call relevant witnesses to testify on his behalf. We find that Rafferty's argument lacks merit.
 {¶ 13} A claim of ineffective assistance of counsel requires Rafferty to satisfy a two-prong test. First, he must prove that trial counsel's performance was deficient. Strickland v. Washington (1984),466 U.S. 668, 687. Rafferty "must *Page 6 
show that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed Appellant by theSixth Amendment." State v. Srock, 9th Dist. No. 22812, 2006-Ohio-251, at ¶ 20, citing Strickland, 466 U.S. at 687. Second, Rafferty must "demonstrate that he was prejudiced by his trial counsel's deficient performance." Srock at ¶ 21. Prejudice entails "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. Further, this Court need not analyze both prongs of the Strickland test if we find that Rafferty failed to prove either. State v. Ray, 9th Dist. No. 22459, 2005-Ohio-4941, at ¶ 10. Finally, Rafferty must overcome the strong presumption that licensed attorneys in Ohio are competent. State v. Smith (1985),17 Ohio St.3d 98, 100.
Cross-Examination
 {¶ 14} In his first argument, Rafferty alleges that his trial counsel's cross-examination of his co-conspirators was not extensive. Specifically, Rafferty alleges that each of his co-conspirators gave numerous pretrial statements and that his trial counsel's efforts at impeaching these witnesses should have been more extensive.
 {¶ 15} "The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." State v. Leonard,104 Ohio St.3d 54, 2004-Ohio-6235, *Page 7 
at ¶ 146. As such, Rafferty's reliance on this argument is misplaced. Furthermore, Rafferty ignores the record when making this argument. Rafferty's trial counsel extensively cross-examined Penix, Kramer, Keenan, and Shutt. The focus of each of these cross-examinations was to highlight the inconsistencies between the witness's current testimony and his or her prior statements to police. Rafferty has not identified any prior inconsistency which was not highlighted by his counsel. Accordingly, he has failed to demonstrate that his trial counsel erred.
Calling of Witnesses
 {¶ 16} "Decisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics." Elyria v. Bozman, 9th Dist. No. 01CA007899, 2002-Ohio-2644, at ¶ 17, quoting State v. Coulter
(1992), 75 Ohio App.3d 219, 230; State v. Toney, 9th Dist. No. 04CA0013,2004-Ohio-4877, at ¶ 11. "Reviewing courts must not use hindsight to second-guess trial strategy, and must keep in mind that different trial counsel will often defend the same case in different manners." State v.McCaleb, 11th Dist. No. 2002-L-157, 2004-Ohio-5940, at ¶ 111, quotingState v. Samatar, 152 Ohio App.3d 311, 2003-Ohio-1639, at ¶ 88.
 {¶ 17} On appeal, Rafferty alleges that his trial counsel should have called two witnesses, Joshua Hayes and Amy Patterson, in his defense. While Rafferty's appellate brief alleges what these witnesses would have stated, the record before this Court does not contain any proffered testimony from these witnesses. *Page 8 
Accordingly, Rafferty has failed to demonstrate that the failure to call these witnesses was not a permissible trial tactic. As such, Rafferty has failed to demonstrate that his trial counsel erred in failing to call these witnesses.
 {¶ 18} In summary, Rafferty has failed to demonstrate that his trial counsel's actions or inactions were deficient. Accordingly, Rafferty's second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "THE EVIDENCE IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW TO SUPPORT A CONVICTION OF AGGRAVATED MURDER AND A RESULT THE APPELLANT'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED."
 ASSIGNMENT OF ERROR IV "THE VERDICTS IN THIS CASE WERE AGAINST THE MANIFEST WEIGHT [OF THE] EVIDENCE AND A RESULT, APPELLANT'S RIGHTS AS PROTECTED BY ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED."
 {¶ 19} In his third assignment of error, Rafferty argues that the State produced insufficient evidence to support his aggravated murder conviction. In his fourth assignment of error, Rafferty asserts that his aggravated murder conviction was against the manifest weight of the evidence. This Court disagrees.
 {¶ 20} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. *Page 9 State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J., concurring). In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, 279. Furthermore:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus; see, also, Thompkins, 78 Ohio St.3d at 386.
In State v. Roberts, this Court explained:
 "[Sufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *4. (Emphasis omitted).
Accordingly, we address Rafferty's challenge to the weight of the evidence first, as it is dispositive of his claim of sufficiency.
 {¶ 21} In determining whether a conviction is against the manifest weight of the evidence an appellate court: *Page 10 
 "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. Thompkins, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten, 33 Ohio App.3d at 340.
 {¶ 22} Rafferty has only challenged his conviction for aggravated murder in violation of R.C. 2903.01(B). R.C. 2903.01(B) provides as follows:
 "No person shall purposely cause the death of another * * * while committing or attempting to commit * * * kidnapping[.]"
In turn, R.C. 2905.01(A)(3) prohibits kidnapping and states as follows:
 "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim or another[.]"
 {¶ 23} On appeal, Rafferty appears to argue that his convictions must be overturned because they rely solely upon the testimony of his co-conspirators. *Page 11 
Specifically, Rafferty argues that the testimony of his co-conspirators was so unreliable that no jury could have believed them and found him guilty of aggravated murder. We disagree.
 {¶ 24} In its case, the State relied heavily upon the testimony of Rafferty's four co-conspirators. However, the State also relied upon the testimony of Rafferty's own cousin, Bobby J. Rafferty. In addition, Rafferty has not disputed that forensic evidence established the following: the house on Voris was the murder scene; the body found in West Virginia was Steven Spade; and that the injuries found on the body were consistent with the events as described by the four co-conspirators.
 {¶ 25} Lisa Penix, one of the co-conspirators and Spade's cousin, testified on behalf of the State as follows. She had not accepted any plea deals from the State and had proceeded to trial and been found guilty of aggravated murder. She gave the following account of the events that began on the evening of February 4, 2005. She, Kramer, Shutt, Keenan, Rafferty, and Spade were all at the house on Voris drinking beer. Rafferty then suggested that they all go downstairs. Once downstairs, Rafferty began to place duct tape around Spade's arms and legs. During this time, Rafferty stated to Spade that this activity "was all about trust." Once Spade was taped up, Rafferty began punching him in the face and Spade fell to the floor. Rafferty then began dragging Spade toward the bathroom in the basement. While dragging Spade to the bathroom, Rafferty came into possession *Page 12 
of Spade's phone. Rafferty then held the phone up, showing that the phone contained Lori Zielienski's phone number. At that time, Rafferty was dating Ms. Zielienski.
 {¶ 26} Penix continued her testimony as follows. Rafferty then took Spade into the toilet area of the bathroom and she heard a lot of loud noises coming from the area. Shutt then handed something to Rafferty. Moments later, Penix heard a gunshot and Rafferty came out of the bathroom. Penix, Keenan, Rafferty, Kramer, and Shutt then returned to the upstairs of the house and continued drinking. Later in the evening, Penix, Rafferty, Shutt, and Kramer returned to the basement. One of the men brought a hacksaw to the basement. Rafferty, Shutt, and Kramer then took turns using the hacksaw on Spade's body until his head was severed from his body. Once the head was removed, Rafferty held the head up, manipulated its mouth, and said to Penix, "Lisa, your cousin has something to say to you." The group then used plastic trash bags to wrap the head and the body and placed them in Rafferty's car.
 {¶ 27} Penix next described disposing of the body. She, Kramer, Shutt, and Rafferty got into Rafferty's car and began driving toward West Virginia. Initially, Kramer was driving but eventually stopped because he felt too intoxicated to continue. Shutt then drove the remainder of the way to West Virginia. After stopping for gas, Shutt drove out into an open farm field. Shutt stopped the car there and Spade's remains were thrown into a field along with a bag of the *Page 13 
assailants' clothes that were worn during the murder. The body and clothes were then doused in gasoline and set on fire. Shutt, Kramer, Penix, and Rafferty then drove back to the Voris street home.
 {¶ 28} Penix continued as follows. Soon after returning from West Virginia, Keenan was summoned to the Voris address to plan an alibi. The defendants planned to tell authorities that Spade had left the prior evening by himself and that they had not seen him since. The parties then began to clean the basement. This included sanding down any areas which might contain evidence, including the basement stairs and walls and the bathroom sink. Moreover, the toilet in the basement was completely removed.
 {¶ 29} Penix's testimony also revealed that this crime came to light when she confessed her involvement to her cousin, Mogadore police officer Eric Berkheimer. At the time Penix confessed, Spade's body had not been identified by West Virginia authorities and no charges were pending from the events of that night.
 {¶ 30} William Kramer's testimony was largely consistent with the testimony provided by Penix. Kramer testified as follows. He, Rafferty, Shutt, Keenan, Penix, and Spade were at the house on Voris drinking beer. Rafferty then suggested that the parties go to the basement to do drugs, specifically methamphetamine. Rafferty then taped Spade up and stated that the exercise was all about trust. Rafferty then began punching Spade. Kramer punched Spade as *Page 14 
well. Rafferty then began dragging Spade to the bathroom and Spade's cell phone fell from his pocket. Rafferty went through the phone and found Zielienski's phone number. Accordingly to Kramer, Rafferty then "flipped out." Rafferty dragged Spade to the toilet and attempted to drown him. When that was unsuccessful, Shutt handed Rafferty a gun. Rafferty placed the gun to the back of Spade's head and fired. Kramer continued, noting that Rafferty later slit Spade's throat with a knife.
 {¶ 31} According to Kramer, he and Shutt then retrieved a hacksaw. Then, he, Shutt, and Rafferty took turns using the hacksaw until Spade had been decapitated. Rafferty then held the head and moved its mouth and quoted, "Lisa, your cousin has something to say to you." Kramer, Rafferty, Shutt, and Penix then drove to West Virginia. Kramer admitted to beginning the drive but asked Shutt to take over because he feared being pulled over due to his intoxication. Upon arriving in the field in West Virginia, Kramer, Shutt, and Rafferty removed Spade's body from the car. Penix then lit the body on fire.
 {¶ 32} Kramer also testified that the four returned to the Voris address and plotted their alibi. Kramer also testified that upon returning to Akron, Penix pulled him aside, kissed him, and stated "Welcome to the family." Kramer also stated that the four then went about cleaning up the crime scene.
 {¶ 33} In turn, Derek Shutt's testimony was presented. Shutt described the events that occurred in a similar manner. Shutt stated that he, Rafferty, Keenan, *Page 15 
Penix, Kramer, and Spade were in the kitchen of the Voris home drinking beer. Rafferty then pulled him aside and told Shutt that Rafferty was going to kill Spade. Rafferty then suggested that the four go to the basement to use methamphetamine. Shutt's testimony indicated that Rafferty, Kramer, Spade, and Penix went to the basement first. Later, Rafferty came up and asked for duct tape. At this time, Shutt gave him the tape and he and Keenan went to the basement. Shutt then overhead the "It's all about trust" comment from Rafferty.
 {¶ 34} Shutt's testimony at this point was consistent with Penix and Kramer. Rafferty taped up Spade, beat him, saw Zielienski's phone number on Spade's cell phone and "freaked out." Shutt then testified that Rafferty put on one glove and asked Shutt for a gun. Rafferty then shot Spade in the back of the head. Rafferty then asked Shutt for a knife and Shutt gave him a knife. When asked what Rafferty did with the knife, Shutt responded as follows: "Bled him out. * * * Put a cut on his neck and blood drained in the toilet." Shutt then continued, stating that trash bags were gathered up and taken to the basement. Then he, Rafferty, and Kramer used the hacksaw to decapitate Spade.
 {¶ 35} Shutt continued testifying as follows. He, Rafferty, Penix, and Kramer drove the body to West Virginia. Kramer began the drive, but Shutt began driving about halfway into the trip. After stopping for gas, Shutt drove down side roads and eventually into an open farm field. The body was removed from the car and Penix lit the body on fire. The four then returned to the Voris address, *Page 16 
summoned Keenan, and planned out their alibi. The defendants then went to work cleaning up the basement, including sanding down the walls and basement steps.
 {¶ 36} Shutt also testified that Rafferty arranged for his cousin Bobby to come to the house to talk about replacing the toilet. During this testimony, Shutt indicated that he and Rafferty had gotten rid of the prior toilet by dumping it in a local creek. Shutt stated that once Bobby left, Rafferty informed Shutt that he had told Bobby what they had done to Spade.
 {¶ 37} The final co-conspirator, Jason Keenan, testified as follows. He went to the Voris address and when he arrived, Rafferty, Penix, Shutt, Kramer, and Spade were there. Rafferty then suggested going to the basement. Prior to going downstairs, however, Rafferty pulled Keenan aside and told him that someone was going to die that night. Keenan's account of the events that took place in the basement then tracks with the accounts given by Penix, Kramer, and Shutt. Rafferty taped up Spade, made the "matter of trust" comment, and began punching Spade. Rafferty then dragged Spade to the bathroom, his cell phone fell from his pocket, and Rafferty found his girlfriend's phone number in it. Rafferty then dragged Spade into the bathroom, continuing the assault. Rafferty then asked Shutt to hand him a gun because he had on only one glove. Rafferty then shot and killed Spade.
 {¶ 38} Everyone then returned upstairs. Keenan informed the group that he had to leave to pick up his girlfriend from work. Shutt spoke with Rafferty and *Page 17 
the group let Keenan leave. A few days later, Keenan was called over to the house to plan the defendants' alibi. At this time, Shutt gave Keenan the gun used that night in a paper bag. Keenan disposed of the gun by throwing it in a public trash can near a car wash. Keenan concluded by testifying that he was not involved in the disposal of the body.
 {¶ 39} Finally, the State relied upon the testimony of Rafferty's cousin, Bobby J. Rafferty. Bobby testified as follows. Rafferty called him one night at roughly 10:30 p.m. to inquire about a toilet and muriatic acid. Bobby informed him that it was too late and that one could be bought from a home improvement store the next day. Rafferty then asked Bobby to come over to the Voris address to look at the bathroom. Rafferty then took Bobby to the basement along with Penix. At that time, there was no longer a toilet in the basement bathroom. According to Bobby, Rafferty then "starts telling me that there was a kid that came in there and he was a narc and they beat him to death." Bobby initially thought that Rafferty was not serious, continuing his testimony as follows:
 "Well, initially when I heard beat him to death, you don't first think that they actually beat him to death. And he starts telling me how they beat him, smashed his head against the toilet, tried to drown him, and Derek handed him a gun and he shot him."
Bobby testified that Rafferty later informed him that he shot the "narc" in the head. Penix then stated that Shutt wanted to know what Bobby thought about everything and Bobby stated that it was none of his business. *Page 18 
 {¶ 40} Bobby continued his testimony as follows. Rafferty explained to Bobby that the prior toilet had been disposed of in a nearby creek. His cousin, Rafferty, then "grabs a razor and he starts picking something off the wall and he says it was brain." Penix then made the comment that she could still "smell gray matter." Penix also stated that "when they were cleaning up [Spade] was laying on the ground and every time she walked past him, she stomped on his head."
 {¶ 41} Bobby admitted that he was terrified to learn these facts, but that he did not go to the police immediately. Bobby only called the police when a toilet and stained shower curtain appeared behind his business. Fearful that he was being framed, Bobby contacted the Akron police and gave the above account of his knowledge, although he could not identify Shutt or Penix by name. The Akron police investigated and the items seen by Bobby were found to be completely unrelated to Spade's murder.
 {¶ 42} Moreover, despite Bobby's account, Akron police were unable to determine whether a murder had occurred at the Voris home. Sergeant Bruce Graham testified that he took Bobby's statement and was able to determine the address of the house which he referenced on Voris. Upon investigating, however, the house appeared vacant at that time. As such, until Penix's confession, police had little idea that Spade had been murdered at the Voris home.
 {¶ 43} In his defense, Rafferty first called Noah Powell. Powell testified that he met Shutt while incarcerated and that Shutt admitted to shooting Spade. *Page 19 
Under cross-examination, Powell retracted his statement that Shutt had admitted to shooting Spade. Powell testified that Shutt had admitted to chopping off Spade's head, not shooting him. This account of events is consistent with Shutt's testimony.
 {¶ 44} Rafferty next called James Weiss to testify. Weiss testified that he had met Rafferty, Keenan, and Shutt while incarcerated. Weiss testified that Shutt admitted to shooting and decapitating Spade. Weiss continued, stating that Keenan admitted to being a part of the murder. According to Weiss, Keenan also admitted that the defendants "had it set up for one person to take the fall." During cross-examination, Weiss admitted that despite being asked specific questions by police detectives, he had never relayed the above information in any prior interview.
 {¶ 45} Finally, Rafferty testified on his own behalf. Rafferty's account of events starts out very similar to the account given by his co-conspirators. The evening began with Rafferty, Shutt, Kramer, Penix, Keenan, and Spade drinking beer. Several trips were made to buy more beer. According to Rafferty, both he and Kramer drank more than the rest of the people present. Rafferty then stated that he began to feel ill and went upstairs. He then got sick in the upstairs bathroom and passed out in the upstairs bedroom. In his testimony, Rafferty stated that he remained passed out throughout the night, oblivious to the gruesome scene occurring in the basement. *Page 20 
 {¶ 46} Rafferty continued his testimony as follows. At some point after the murder, both Penix and Kramer informed him of what they had done. Rafferty, however, did not believe them. Rafferty asked for proof and Shutt and Penix drove him to West Virginia. Shutt was unable to locate the open field and Rafferty continued to disbelieve their stories. Later, Rafferty moved back to Louisiana where he had spent time while growing up.
 {¶ 47} Under cross-examination, Rafferty's account of events diverged further from the accounts of everyone else there that evening. When initially questioned by police while he was in Louisiana, Rafferty suggested that perhaps an individual named Duey had committed the crime. No other person in the investigation had ever mentioned this name, and Rafferty was unable to give a last name for Duey to the police. Rafferty also stated that another individual named Brian was at the Voris house on the night in question. Rafferty could not give a last name for this individual or explain how he came to be at the Voris address.
 {¶ 48} Most damaging for Rafferty, he could not explain why Shutt, Kramer, Penix, and Keenan would all lie to implicate him. Under cross-examination, Rafferty surmised that each was willing to implicate him in the murder in avoid to the death penalty. Rafferty's explanation, however, is fatally flawed.
 {¶ 49} First, as detailed above, Penix confessed to her involvement in the crime before West Virginia police had even identified Spade. At the point in time *Page 21 
when Penix confessed, police had already investigated Bobby Rafferty's statement and had been unable to verify it. By confessing, Penix actually placed the death penalty at issue and virtually guaranteed herself a severe punishment.
 {¶ 50} Moreover, to the extent that Rafferty relies upon the inconsistencies among the statements given by his co-conspirators, his reliance is misplaced. A majority of the inconsistencies are generated by the testimony of Penix. Throughout her testimony, Penix attempted to minimize her involvement and culpability in Spade's murder. As the only testifying co-conspirator who had not plead guilty, Penix's attempt to portray herself as a victim is explained.
 {¶ 51} Furthermore, the co-conspirator's testimonies were consistent upon all of the major events that occurred that night. They each testified that Rafferty had taped up Spade and made the trust comment. All four testified that Rafferty beat Spade and became enraged when he found Zielienski's phone number in Spade's cell phone. All four testified that Shutt handed Rafferty a gun and that Rafferty shot Spade in the back of the head. All four testified that Rafferty aided in decapitating Spade with the hacksaw and assisted in the disposal of the body.
 {¶ 52} Finally, even if this Court were to assume that the co-conspirators had some motive to be dishonest, Rafferty cannot explain the testimony of his cousin Bobby. Bobby had no prior relationship with any of the co-conspirators. However, prior to Spade's body being identified, Bobby went to the police with specific details about the crime. Bobby testified about the initial beating of Spade, *Page 22 
the attempted drowning in the toilet, and the bullet wound to the back of Spade's head. The testimony of the co-conspirators and the undisputed medical testimony all demonstrated that Bobby had accurately described the crime. Rafferty has been unable to explain how Bobby could possibly know this information. Under examination, Rafferty concluded that Shutt or Penix must have told Bobby what happened, despite the fact that they barely knew him, and at the same time persuaded Bobby to set up Rafferty.
 {¶ 53} Upon review, other than his own unsubstantiated testimony, all of the evidence presented weighs against Rafferty. All four co-conspirators testified that Rafferty bound Spade with duct tape, meeting the restraint element of kidnapping. All four co-conspirators and Bobby testified that Rafferty beat and then killed Spade after binding him, meeting the infliction of serious physical harm element of kidnapping. Finally, it is undisputed that Spade's death was a result of the beating and gunshot wound to his head.
 {¶ 54} Based upon the above, the State presented ample evidence on each of the elements of kidnapping and aggravated murder. Accordingly, we cannot conclude that the jury lost its way when it convicted Rafferty. Rafferty's convictions, therefore, were not against the manifest weight of the evidence. Having disposed of Rafferty's challenge to the weight of the evidence, we similarly dispose of his sufficiency challenge. See Roberts, supra, at *2. Rafferty's third and fourth assignments of error are overruled. *Page 23 
 ASSIGNMENT OF ERROR V "CONSIDERED TOGETHER, THE CUMULATIVE ERRORS IN THE TRIAL DEPRIVED THE APPELLANT OF A FAIR TRIAL IN VIOLATION OF APPELLANT'S 6TH AND 14TH AMENDMENT RIGHTS UNDER THE UNITED CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 55} In his fifth assignment of error, Rafferty asserts that any errors that were deemed harmless individually amount to prejudicial error when considered cumulative. We find no merit in Rafferty's argument.
 {¶ 56} "Although violations of the Rules of Evidence during trial, singularly, may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." State v.DeMarco (1987), 31 Ohio St.3d 191, paragraph two of the syllabus. Having found no errors in the trial court proceedings, it follows that Rafferty cannot rely upon the cumulative effect doctrine. Rafferty's fifth assignment of error lacks merit.
 ASSIGNMENT OF ERROR VI "PROSECUTORIAL MISCONDUCT DEPRIVED THE APPELLANT OF A FAIR TRIAL, IN VIOLATION OF APPELLANT'S 6TH
AND 14TH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 57} In his sixth assignment of error, Rafferty alleges that the State engaged in prosecutorial misconduct during its closing argument. This Court finds no merit in Rafferty's sixth assignment of error. *Page 24 
 {¶ 58} The Supreme Court of Ohio has limited the instances when a judgment may be reversed on grounds of prosecutorial misconduct. SeeState v. Lott (1990), 51 Ohio St.3d 160, 166. The analysis of cases alleging prosecutorial misconduct focuses on the fairness of the trial and not the culpability of the prosecutor. Id. A reviewing court is to consider the trial record as a whole, and is to ignore harmless errors "including most constitutional violations." Id., quoting United Statesv. Hasting (1983), 461 U.S. 499, 508-509. Accordingly, a judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial. State v. Carter (1995),72 Ohio St.3d 545, 557. In the instant matter, Appellant did not object to the prosecutor's alleged misconduct during his closing argument. As such, Appellant has waived all but plain error regarding these comments.State v. Slagle (1992), 65 Ohio St.3d 597, 604.
 {¶ 59} "In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a reviewing court must determine if the remarks were improper, and, if so, whether they actually prejudiced the substantial rights of the defendant." State v. Overholt, 9th Dist. No. 02CA0108-M, 2003-Ohio-3500, at ¶ 47, citing State v. Smith (1984),14 Ohio St.3d 13, 14. "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." State v.Hill (1996), 75 Ohio St.3d 195, 204, citing Donnelly v.DeChristoforo (1974), 416 U.S. 637, 647. Furthermore, the appellant must show *Page 25 
that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceeding would have been different.State v. Loza (1994), 71 Ohio St.3d 61, 78.
 {¶ 60} In the instant matter, the prosecution did misstate one piece of evidence in this matter. In its closing argument, the prosecution stated as follows:
 "The shop vac, there is the link. The only link they want to downplay is the shop vac, which Detective Harrah got from Voris [Street] because that's where Lisa Penix told him it was. But the reason it became important was because she said it was used to clean up the basement. That's why it's important, not for any other reason."
Rafferty is correct that Detective Harrah testified that the shop vac was recovered in Mogadore after Lisa Penix informed him that it was at her mother's home. This minor misstatement, however, cannot be properly labeled prosecutorial misconduct.
 {¶ 61} At the introduction to its closing argument, the State informed the jury that its argument was not evidence. Moreover, the State informed the jury that if it inadvertently misstated evidence, the jury was to rely upon its own memory of the evidence. In a trial transcript that encompasses roughly 1,600 pages, the fact that the shop vac was retrieved from Mogadore was mentioned on two pages by Detective Harrah. In approximately fifty pages of closing argument, the State mentioned the location of the shop vac on one occasion, as quoted above. Even in that quote, the State emphasized that the shop vac had been used to clean up the crime and that was the only reason that it was important. The State did not *Page 26 
stress in any manner that where the shop vac was recovered from had any significance. Accordingly, Rafferty has failed to demonstrate prosecutorial misconduct.
 {¶ 62} Rafferty's sixth assignment of error is overruled.
 ASSIGNMENT OF ERROR VII "THE APPELLANT ALLEGES THAT CONDUCT BY THE TRIAL JUDGE AMOUNTED TO JUDICIAL MISCONDUCT WHICH DEPRIVED THE APPELLANT OF A FAIR TRIAL IN VIOLATION OF APPELLANT'S 6TH AND 14TH AMENDMENT RIGHTS UNDER THE UNITED CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."
 {¶ 63} In his final assignment of error, Rafferty alleges that the judge in his trial engaged in misconduct. This Court finds that Rafferty's argument lacks any basis in the record.
 {¶ 64} In his final assignment of error, Rafferty has conceded that his alleged errors cannot be demonstrated in the record before this Court. Specifically, Rafferty relies upon allegations that the trial court judge "roll[ed] her eyes" during his case and made other "non verbal gestures" that acted to his prejudice. As none of this alleged misconduct is contained in the record before us, Rafferty's final assignment of error lacks merit. *Page 27 
 III. {¶ 65} Rafferty's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
 Costs taxed to Appellant. *Page 28 
SLABY, P. J., CARR, J., CONCUR
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.) *Page 1